**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF PUERTO RICO**

**GISELA GONZALEZ-LOPEZ, et al.,**

    **Plaintiffs,**

    **v.**

                      **Civil No. 18-1961 (ADC)**

**YAUCO HEALTH CARE**
**CORPORATION, et. al.,**

    **Defendants.**

---

**OPINION AND ORDER**

Pending before the Court are co-defendants Sr. Germán Burgos-Ferrer's ("Dr. Burgos") motion for summary judgment, **ECF No. 99**, Yauco Health Care Corporation d/b/a Pavía Hospital Yauco ("Pavía Yauco"), Jamie Vega, and Verónica Martínez-Garza's motion for summary judgment, **ECF Nos. 101, 106**, and Sindicato de Aseguradoras para la Suscripción Conjunta de Seguros de Responsabilidad Profesional Médico-Hospitalaria ("SIMED") motions for joinder, **ECF Nos. 104, 105**.

For the reasons explained below, the Court **GRANTS** the motions for summary judgment at **ECF Nos. 101, 106** and **DISMISSES** with prejudice all of plaintiffs' claims under EMTALA, *infra*.

## I.      Procedural Background

Plaintiffs Gisela González-López, Israel Burgos, and the Conjugal Partnership between them ("as heir[s] of Israel José Burgos-González") filed a complaint[1] against several co-defendants under this Court's federal question jurisdiction for the death of Israel José Burgos-González. **ECF No. 1**.[2] Plaintiffs asserted claims of medical malpractice under the Puerto Rico tort statute and claims under the Emergency Medical Treatment and Active Labor Act ("EMTALA"), 42 U.S.C. §1395 dd, *et seq.* against all defendants. *Id.*

Pursuant to plaintiffs' notice of voluntary dismissal, **ECF Nos. 88, 89**, the Court entered partial judgment dismissing all claims against several co-defendants. *See* **ECF Nos. 93, 95**. The remaining defendants filed answers to the complaint. *See* **ECF Nos. 37, 39, 40, 42, 43**.

Following a settlement conference, on April 29, 2021, co-defendant Dr. Burgos filed a motion for summary judgment requesting dismissal of all claims including the state court medical malpractice claims along with a "Statement of Uncontested Material Facts" ("SUMF") in support. **ECF Nos. 99, 99-1**. Plaintiffs filed a motion in opposition and a "Statement of Contested Material Facts." **ECF Nos. 107, 107-1**. Dr. Burgos filed a reply arguing, among other

---

[1] **ECF No. 1** at 2.

[2] Plaintiffs filed a motion to amend the complaint at **ECF No. 96**, which purported to include medical personnel from the Puerto Rico Medical Center, was opposed by defendants on various grounds. Plaintiffs, however, did not offer any arguments in support of their request to amend the complaint or present any counter argument. Thus, the Court denied plaintiffs motion to amend the complaint at **ECF No.96**. *See* **ECF No. 133**.

things, that plaintiffs' "Statement of Contested Material Facts" "fails to comply with the clear mandates of Local Rule 5(c)." **ECF No. 112** at 1. Plaintiffs sur-replied, **ECF No. 116**.

On April 30, 2021, co-defendants Pavía Yauco, Jamie Vega, and Verónica Martínez-Galarza filed a motion for summary judgment accompanied by a SUMF, and a memorandum of law in support thereof. **ECF Nos. 101, 101-1, 101-7**. Plaintiffs filed an opposition and a "Statement of Contested Material Facts." **ECF Nos. 110, 110-1**. However, plaintiffs failed to address, admit, deny, or qualify the SUMF submitted with the motion for summary judgment as required by Local Rule 56. Co-defendants Pavía Yauco, Jamie Vega, and Verónica Martínez-Galarza filed a reply pointing out that plaintiffs' "Statement of Contested Material Facts" "does not comply with the dispositions of Local Civil Rule 56(c)[,]" thus, they argue, "all the uncontested material facts included in the [SUMF]… should be deemed as admitted." **ECF No. 118** at 2.

The Court granted co-defendants Pavía Yauco, Jamie Vega, and Verónica Martínez-Galarza's motion for leave to file an additional dispositive motion. **ECF No. 103**. Accordingly, on May 5, 2021, co-defendants Jamie Vega and Verónica Martínez-Galarza filed a motion for summary judgment specifically arguing that EMTALA claims are not available against individuals or medical staff. **ECF No. 106**. Co-defendants submitted a SUMF in support. **ECF No. 106-1**. Plaintiffs filed an opposition. **ECF No. 113**. Unlike the case with the other two oppositions to summary judgment, this time plaintiffs filed a "Response to [SUMF]" addressing

the SUMF submitted by co-defendants Jamie Vega and Verónica Martínez-Galarza with their second motion for summary judgment. *See* **ECF No. 113-1**. Nonetheless, plaintiffs also filed yet another "Statement of Contested Material Facts." **ECF No. 113-2**. Jamie Vega and Verónica Martínez-Galarza replied and plaintiffs sur-replied. **ECF Nos. 120, 124**.

SIMED filed motions for joinder. **ECF No. 104, 105**. The Court held a status conference on October 13, 2021. The parties took turns arguing their position in connection with the case and the pending motions for summary judgment. Co-defendants (including counsel for Dr. Guzmán) challenged the "application of EMTALA to defendants in their individual capacity." *See* **ECF No. 133** at 1. "In response to specific questioning, counsel for plaintiffs admitted that medical personnel nor the doctors may be personally liable under EMTALA." *Id*. at 2. Accordingly, the Court ordered the dismissal of "any such claims." *Id*. at 2. Plaintiffs did not move to alter amend that Order, nor did they file a notice of appeal.

## II.   Plaintiffs' failure to comply with this District Court's Local Rules

As an initial matter, the Court will address plaintiffs' noncompliance with Fed. R. Civ. P. 56 and Local Rule 56. Under Local Rule 56(c):

> A party opposing a motion for summary judgment shall submit with its opposition a separate, short, and concise statement of material facts. The opposing statement **shall admit, deny or qualify the facts supporting the motion for summary judgment** by reference to each numbered paragraph of the moving party's statement of material facts. Unless a fact is admitted, the opposing statement shall support each denial or qualification by a record citation as required by this rule. The opposing statement may contain in a separate section additional facts, set forth in separate numbered

paragraphs and supported by a record citation as required by subsection
(e) of this rule. (Emphasis added).

If a party improperly controverts the facts, the court may treat those facts as uncontroverted. *Natal Pérez v. Oriental Bank & Tr.*, 291 F.Supp.3d 215, 219 (D.P.R. 2018). While the district court may "forgive" a violation of Local Rule 56, litigants who ignore the rule do so "at their peril." *Mariani-Colón v. Dep't of Homeland Sec. ex rel. Chertoff*, 511 F.3d 216, 219 (1st Cir. 2007), *Puerto Rico American Ins. Co. v. Rivera–Vázquez*, 603 F.3d 125, 131 (1st Cir. 2010).

Plaintiffs blatantly disregarded Local Rule 56(c). Indeed, plaintiffs did not address in any shape or form the SUMF submitted by defendants. To wit, in their "Statement of Contested Material Facts" at **ECF No. 107,** plaintiffs did not address, admit, deny, or qualify any of Dr. Burgos' SUMF at **ECF No. 99-1**. Likewise, in their "Statement of Contested Material Facts" at **ECF No. 110-1**, plaintiffs failed to admit, deny, or qualify a single statement included in co-defendants Pavía Yauco, Jamie Vega, and Verónica Martínez-Galarza's SUMF at **ECF No. 101-1**.

Most of plaintiffs' "Statement of Contested Material Facts" are paragraphs with statements that have no bearing or connection to the underlying proposed fact. Indeed, most of plaintiffs' "Statement of Contested Material Facts" simply repeat plaintiffs' general allegations, and legal conclusions. Thus, plaintiff "Statement of Contested Material Facts" filed in opposition to defendant's SUMF clearly fails to comply with Local Rule 56(c) and Fed. R. Civ. P. 56. Because of plaintiffs' deviation "with the standards of Local Rule 56, [the Court] is free, in the exercise of

its sound discretion, to accept the moving party's facts as stated." *Adv. Flexible Circuits, Inc. v. GE Sensing & Inspection Techs. GmbH*, 781 F.3d 510, 521 (1st Cir.  2015)(citations and internal quotation marks omitted).

### III.     Undisputed Facts[3]

Pavía Yauco is subject to the provisions of EMTALA, 42 U.S.C. §1395dd et seq. 2. **ECF No. 101-1** at 1.

Israel José Burgos-González was 20 years-old and suffered from Cerebral Palsy disorder. Around 6:45 p.m. on December 13, 2017, Israel José Burgos-González and his mother, plaintiff Gisela González-López, were taken in an ambulance to the Pavía Yauco's emergency room ("ER") after being involved in a car accident. Plaintiff Gisela González-López was driving the car when she had an epileptic seizure and crashed. *Id*., **ECF No. 1** ¶39.

Upon arrival, Israel José Burgos-González was promptly triaged by co-defendant Verónica Martínez-Garza, BSN, "who noted as Chief Complaint that family member refers (sic) that they were involved in an accident and came due to multiple trauma." **ECF No. 101-1** at 2; **ECF No. 101-2** at 30-33; **ECF No. 101-3** at 46. She also noted that the patient had no pain at the time and described him as alert, and his mental state as confused/disoriented. *Id*. His vital signs

---

[3] Aside from those specifically identified herein, the Court draws these facts from the well-pleaded facts asserted in the pleadings and the SUMF submitted by the parties that comply with Local Rule 56. *See CMI Capital Market Inv. v. González-Toro*, 520 F.3d 58, 62 (1st Cir. 2008). Although the court reviewed every statement submitted by the parties, it will only consider and include in this Opinion and Order those facts that are material for purposes of summary judgment as mandated by Fed. R. Civ. P. 56.

were listed as: BP 138/89, T 36.7°C, P 100 bpm, R 16 rpm, and O₂Sat 95%. *Id*. The patient was categorized as: Semi-Urgent. *Id*. The patient's vital signs at triage were normal. **ECF No. 101-3 at 50.**

After triage, the Israel José Burgos-González was brought into the ER's observation area and was placed in the same cubicle as his mother. **ECF No. 101-4** at 36-37. According to the medical records, Israel José Burgos-González was admitted to the ER at 7:30 p.m. **ECF No. 101-2** at 5. At 7:30 p.m., co-defendant Jamie Vega, BSN, logged that the patient was received from prior shift (which ended at 7:00 pm), that he was alert and oriented at the moment, that initial evaluation by a physician was pending, and that he was accompanied by a family member. **ECF No. 101-2** at 33.

After evaluating plaintiff Gisela González-López, Dr. Burgos evaluated Israel José Burgos-González, investigated his medical history and performed a physical examination, which was documented in the medical record at around 8:44 p.m. **ECF No. 101-2** at 6-7. Dr. Burgos noted the chief complaint as: "Israel Burgos is a 20-year(s) years (sic) old male, the reason of visit is CHEST CONTUSION AND ABDJOMINAL (sic) CONTUSION DONE TODAY AS A RESULT OF A MVA." On physical examination, the patient was noted to be:

"Active, Alert"; HEENT was noted to be "Unremarkable"; the heart was noted with "Regular Rhythm, no murmurs"; lungs were noted to be "CLEAR TO AUSCULTATION IN BOTH LUNGS"; the thorax was noted with "CHEST ECHIMOSIS"; and the abdomen was also noted with "ABDOMINAL ECHIMOSIS AREA". Neurologically, the patient was noted to have "No Gross Focal Deficits".

Working Diagnosis/Problem was noted as: "Injury involving multiple body regions".

**ECF No. 101-2** at 6-7; **ECF No. 101-3** at 52, 55.

On or around 8:50 p.m., Dr. Burgos ordered multiple labs and diagnostic tests, including "Basic Metabolic Panel, CBC with Diff., Urinalysis complete, Head or Brain CT w/o Contrast, Cervical 2 or 3 views, CT Abdomen-Pelvic w/o Contrast, and CT Thoracic w/o Contrast." **ECF No. 101-2** at 5-6, 11-16; **ECF No. 101-3** at 55. He also ordered several medications, including "Benadryl 50 mg IM, Lorazepam 2 mg IM, and Toradol 60 mg IM." **ECF No. 101-2** at 10, 11-16; **ECF No. 101-3** at 55-56. These orders were "executed by nursing personnel." ECF No. 101-1 at 4, **ECF No. 101-2** at 10; **ECF No. 101-3** at 55.

On or around 9:50 p.m., Ms. Melanie Torres-Vélez, BSN, documented that the patient was evaluated by Dr. Burgos, who ordered treatment, and that family member was oriented. She noted that the patient "had a Glasgow Scale of 15." She also documented that the patient was observed with a hematoma in his right eye and right flank, in addition to wounds by seatbelt in the abdomen and left side of his chest. Further, she noted that samples were taken for the "CBC, BMP and U/A, and that Ativan 2mg, Benadryl 50mg and Toradol 60mg were administered IM," and that the patient was being monitored for significant changes. **ECF No. 101-2** at 34; **ECF No. 101-3** at 56.

Results for the BMP and CBC were reported at 10:25 p.m. On or around 11:44 p.m., Dr. Burgos ordered a CT Thorax with contrast. **ECF No. 101-2** at 13, 20-21. On or around 12:38 in the

morning of December 14, 2017, Dr. Burgos ordered Reglan 10 mg IV. *Id.*, at 10. At 1:53 a.m., a CT Head without IV contrast was performed. The study was interpreted by Dr. Jénnifer Rodríguez-Ferrer ("Dr. Rodríguez"), Radiologist, with an impression of: "No evidence of acute intracranial hemorrhage. No skull fracture." **ECF No. 101-2** at 27-28. At around 1:58 a.m., a CT Thorax with contrast and a CT Scan abdomen and pelvis with contrast were ordered. *Id.*, at 5. 2:00 am, a CT Chest, abdomen and pelvis without IV contrast was performed. It was documented in the report that "No IV contrast was given due to poor venous access". *Id.*, at 23

Due to the shift change, Dr. Burgos transferred the patient's care to Dr. Guzmán. **ECF No. 101-5** at 2. From approximately 2:30 to 3:00 a.m., after examination of the CT Chest, abdomen and pelvis was completed, X-Ray technicians discussed with Dr. Guzmán preliminary findings and diagnosis of sternum fracture and possible laceration of the spleen. **ECF No. 101-2** at 25, **101-5** at 2. In consideration of the preliminary findings and diagnosis discussed with the X-Ray technicians, Dr. Guzmán began calling the Puerto Rico Medical Center in Río Piedras to make arrangements for the patient's transfer to a trauma hospital. **ECF No. 101-5** at 2-4.

Approximately at 3:30 a.m., Ms. Melanie Torres-Vélez, BSN, noted that the patient was asleep and accompanied by family member, and that the patient continued to be monitored for significant changes. **ECF No. 101-2** at 36. At 5:27 a.m., Mr. Joseán Velázquez, RN, documented that he placed an IV on the patient's left hand under aseptic measures with Angio #20. *Id.*, at 37.

At around 6:00 a.m., Dr. Guzmán was able to speak to Dr. Díaz at the emergency room of the Puerto Rico Medical Center, and presented the case to him, but Dr. Díaz requested that a CT Scan with IV contrast be done and to wait for the official interpretation from the Radiologist to present the case for transfer. **ECF No. 101-2** at 9; **ECF No. 101-5**. ER personnel continued to make efforts to perform the CT Scan with IV contrast, which was complicated due to the patient's condition of cerebral palsy. **ECF No. 101-5** at 2-4. At 8:41 a.m., Ms. Jamie Vega, RN, documented that the patient had been taken to the CT area. However, because the patient became agitated, the studies could not be performed, and he was sent back to the ER area. **ECF No. 101-2** at 38.

On or around 9:09 a.m., Ms. Nilda Cintrón, RN, ("Ms. Cintrón") noted that the patient had pain in the abdominal area, which was described as stabbing and continuous. She documented that the patient was alert, and oriented in person, and that an Abdomino-Pelvic CT with IV contrast was pending. **ECF No. 101-2** at 39.

At around 10:40 a.m., Ms. Cintrón documented that a call was received from the Imaging Center requesting that the patient be canalized because a study was going to be performed on the patient. Upon arrival, he was observed pale, with cyanotic lips, cold skin and respiratory difficulty. Patient was brought back to the ER. Dr. Guzmán evaluated him and a cardiac monitor was placed. Patient continued presenting respiratory difficulty and CPR was started. Medical personnel tried to place an IV without success. Dr. Guzmán asked to call the Operating Room.

**ECF No. 101-2** at 41, 45. At 10:50 a.m., "Ms. Cintrón documented that the OR was called and that Dr. Maíz referred he would come down (to the ER) to place a central line on the patient." *Id*., at 42, 45. At around 11:00 a.m., Ms. Cintrón documented that the patient was intubated, and DXT done (194 mg/dl). Dr. Maíz placed the central line with the assistance of Anesthesiologist, Dr. Barranco. *Id*. At around 11:20 am, Ms. Cintrón documented that the patient was declared dead by Dr. Guzmán. *Id*.

At 11:59 a.m., Dr. Guzmán documented in the electronic record that he had called Puerto Rico Medical Center, spoke to Dr. Díaz, and referred the 20-year-old patient with multiple body trauma, "who presented sternum fracture and possible spleen laceration." **ECF No. 101-1** at 8. He noted that Dr. Díaz requested that a study with IV contrast be done, and to wait for the official interpretation to present the case. **ECF No. 101-2** at 9; **ECF No. 101-5**.

Five minutes later, Dr. Guzmán documented that he had been called to the radiology area to evaluate a patient who was there for a contrast study due to multiple body trauma to rule-out a spleen laceration. He arrived at 10:40 a.m. to evaluate the 20-year-old patient with cerebral palsy who was hypoactive, pale and with respiratory distress. He also documented that the patient was transferred to the ER and that CPR was started with respiration. Patient could not be canalized. Thus, Dr. Guzmán added, Dr. Maíz was called in OR to place a central line. Patient was intubated with endotracheal tube 7.5 and Dr. Maíz placed the central line. "Epinephrine is given by the endotracheal tube x 2 doses. Then, Epinephrine was administered 1:10,000 every

3-5 min x 3 doses. Bicarbonate 0.9 NSS was also administered. Patient did not respond to treatment. Patient was re-evaluated but presented no cardiac sounds, no lung sounds, no pulse, no neurologic response to pain and non-reactive pupils, and was declared dead at 11:20 am." **ECF No. 101-1** at 9, **ECF No. 101-2** at 8.

Plaintiffs' expert, Dr. Manuel Pérez-Pabón, admitted that, at the time the patient developed cardio-respiratory arrest, he was still being evaluated, assessed, and treated at the ER. **ECF No. 101-3** at 70. Plaintiff Gisela González-López admitted that ER personnel tried to perform the abdominal CT scan with contrast on her son several times and were able to perform one without contrast. She also admitted that they kept trying to perform the CT scan until the morning of December 14, 2017. **ECF No. 101-4** at 42-44. Plaintiff Israel Burgos admitted that ER personnel tried to have a CT done on his son several times throughout the night until the morning, and that the last time they moved him out of the ER area to the Radiology area to have it done was at around 9:30 a.m. **ECF No. 101-6** at 19.

## IV.    Legal Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A 'genuine' issue is one that could be resolved in favor of either party, and a 'material fact' is one that has the potential of affecting the outcome of the case." *Calero-Cerezo v. United States Dept. of Justice*, 355 F.3d 6, 19 (1st Cir. 2004); *Murray v. Warren Pumps, LLC*, 821 F.3d 77, 83

(1st Cir. 2016) (citations omitted); *see* Fed. R. Civ. P. 56(a). Although the Court states the facts in the light most favorable to the party against whom summary judgment is entered, the Court is still required "to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." *Adria Int'l Grp., Inc. v. Ferre Dev., Inc.*, 241 F.3d 103, 107 (1st Cir. 2001) (citation omitted).

In order to defeat a properly supported motion for summary judgment, the non-moving party must set forth facts showing that there is a genuine dispute for trial. *Tropigas de P.R., Inc. v. Certain Underwriters at Lloyd's of London*, 637 F.3d 53, 56 (1st Cir. 2011). "When a non-moving party fails to file a timely opposition to an adversary's motion for summary judgment, the court may consider the summary judgment motion unopposed, and take as uncontested all evidence presented with that motion." *Pérez-Cordero v. Wal-Mart Puerto Rico*, 440 F.3d 531, 533–34 (1st Cir. 2006) (citing *NEPSK, Inc. v. Houlton,* 283 F.3d 1, 7–8 (1st Cir. 2002)). The Court must still scrutinize the summary judgment motion under the terms of the Federal Rules of Civil Procedure but, "[i]n most cases, a party's failure to oppose summary judgment is fatal to its case." *Id*. at 534.

L. Civ. R. 56(c) states, in pertinent part, "[a] party opposing a motion for summary judgment shall submit with its opposition a separate, short, and concise statement of material facts." *Id*. As discussed herein, plaintiffs' opposing statements are replete with supplemental information in clear violation of applicable rules. *See Tropigas de Puerto Rico, Inc. v. Certain*

*Underwriters at Lloyd's of London*, 637 F.3d 53, 57 (1st Cir. 2011) ("Local Rule 56 is in service to Federal Rule of Civil Procedure 56.").

Moreover, L. Civ. R. 56(e) provides that "[f]acts contained in a supporting or opposing statement of material facts, if supported by record citations as required by this rule, shall be deemed admitted unless properly controverted. . . The [C]ourt shall have no independent duty to search or consider any part of the record not specifically referenced by the parties' separate statement of facts."

## V.     Discussion

### A.     EMTALA Claims Against Individuals

During the hearing held on October 13, 2021, plaintiff conceded that "medical personnel nor the doctors may be personally liable under EMTALA." **ECF No. 133** at 1. *See, inter alia, Medero-Díaz v. Grupo De Empresas De Salud*, 112 F. Supp. 2d 222, 225 (D.P.R. 2000)("EMTALA does not provide for a private cause of action against individual physicians." (citations omitted)). Accordingly, the Court dismissed "any such claims." *Id*. Considering Section 1395dd(d)(A) and in light of the fact that plaintiffs have not moved to amend or alter that Order, the Court hereby **GRANTS** the motion for summary judgment at **ECF No. 106** and, accordingly, dismisses all and any EMTALA claims against all defendants with the exception of Pavía Yauco.[4]

---

[4] However, as discussed herein, plaintiffs' EMTALA claims against Pavía Yauco are dismissed under different grounds.

The Court will now address the motion for summary judgment at **ECF No. 101**.

**B.      EMTALA Claims Against Hospital Pavía Yauco**

Pavía Yauco admits it is hospital "subject to the provisions of" EMTALA. **ECF No. 101-1** at 1. However, it argues that plaintiffs' claims "do not give rise to a valid cause of action under EMTALA." **ECF No. 101-7** at 13. In any case, Pavía Yauco avers, plaintiffs' claims constitute a medical malpractice case, which "should be pursued in state courts" because the EMTALA claims are not viable. *Id*., at 13; *see* **ECF No. 101-7** at 18-19.

In response, without properly addressing Pavía Yauco's SUMF, plaintiffs argued that EMTALA applies to the facts of this case because the patient "was never stabilized… was never discharged… never left or turned into an in patient (sic)." **ECF No. 110** at 7. The fact that Pavía Yauco performed a "screening" at triage and that the patient was under the care of an emergency room physician, plaintiffs contend, "does not mean that [Pavía Yauco] had concluded their (sic) responsibility under EMTALA." *Id*., at 8.

In support of their arguments, plaintiffs specifically point to the fact that Dr. Guzmán waited for the patient to be visibly morbid and with respiratory difficulty to finally call the operating room to place a central line in the patient. *Id*. "Had this been performed… 14-hour prior, he would have been tested and… ready for transfer to specialized medical center." *Id*., 8-9. Furthermore, plaintiffs claim that the first "assessment" of the patient occurred approximately 2 hours after the patient was triaged. *Id*., at 9. The doctors, according to plaintiffs, also waited

approximately 2 hours "to order a CT thorax without contrast" from the time they assessed "chest contusion and abdominal contusion." *Id*. Other deviations from the accepted standard of care were, according to plaintiffs, the corrections, or "crossovers" on handwritten medical notes, as well lack of information therein. *Id*., at 10. In sum, plaintiffs' argument under EMTALA boils down to the fact that, in plaintiffs' view, defendants' negligence "worked against the patient's stabilization in violation of EMTALA." *Id*., at 10.

Plaintiffs confuse and mix up a hospital's screening duty with the duty to stabilize under EMTALA. For example, while asserting that the hospital failed to properly screen the patient, plaintiffs reasoned that triage and the care of a physician are not enough because "stabilization… is until discharge and/or proper transfer." **ECF No. 110** at 8. Similarly, plaintiffs contend "appropriate… screening examination… is not fulfilled by a brief triage evaluation[,] it is more an ongoing process that ends when… stabilized." *Id*., at 7. However, the sections of EMTALA that deal with screening and stabilizing must be read disjunctively. *López Soto v. Hawayek*, 175 F.3d 170, 171 (1st Cir. 1999)("[s]ubsection (a) requires hospitals to provide appropriate screening for individuals who seek assistance at an emergency department of a covered hospital, whereas subsection (b) serves a different purpose—obligating hospitals to stabilize individuals [] when emergency medical conditions are detected. In short, these two provisions create distinct obligations and apply to different classes of individuals." *Id*., at 175).

Accordingly, the Court will address both requirements separately.

### (i)    Screening

"A hospital fulfills its statutory duty to screen patients in its emergency room if it provides for a screening examination reasonably calculated to identify critical medical conditions that may be afflicting symptomatic patients and provides that level of screening uniformly to all those who present substantially similar complaints." *Correa v. Hosp. San Francisco*, 69 F.3d 1184, 1192 (1st Cir. 1995)(citing *Baber v. Hospital Corp. of Am.*, 977 F.2d 872, 879 (4th Cir.1992); *Gatewood v. Washington Healthcare Corp.*, 933 F.2d 1037, 1041 (D.C.Cir.1991)). "The essence of this requirement is that there be some screening procedure, and that it be administered even-handedly." *Correa, id*.

As discussed before, plaintiffs put forth little to no argument or support as it pertains to their "screening" claim under EMTALA. In their opposition, plaintiffs state (without citing legal authority)[5] their understanding of EMTALA's mandates. **ECF No. 110** at 5-7. Next, they concede that "appropriate screening" is not "defined" in the statute. Again, without reference to any legal authority, plaintiffs argue that EMTALA's screening mandate "does not include merely a history and physical [evaluations] and clearly is not fulfilled by a brief triage evaluation." **ECF No. 101** at 7. Following this averment, plaintiffs jump to the stabilization mandate under EMTALA. *Id*. Not only is plaintiffs' discussion of the screening standard absent,

---

[5] The only reference in support is a citation of material anent "patient transfer[,]" issue that, as discussed before, is not relevant to the present controversy of screening. *See* **ECF No. 110** at 7.

but every single time plaintiffs mention EMTALA's screening mandate is only related to or in the context of the hospital's failure to stabilize the patient. *See* **ECF No. 110** at 7, 8, 13.

On the other hand, Pavía Yauco asserted that they performed "several diagnostic tests, including laboratories, diagnostic and imaging studies, X-rays and CT Scans were ordered and performed… multiple medications were administered, as per medical orders, to manage the patient's condition." **ECF No. 101-7** at 13. "Moreover," it adds, "once the preliminary findings and diagnosis of sternum fracture and possible laceration of the spleen were discussed with Dr. Guzmán, he began to call the Puerto Rico Medical Center to make arrangements for the patient's transfer to a trauma hospital… the patient continued to be evaluated, monitored, cared for and treated… Efforts continued to be made to get imaging studies done with IV contrast for confirmation of the patient's diagnoses and better management of his condition." *Id*. These averments are backed up by Pavía Yauco's SUMF, which plaintiffs failed to oppose pursuant to Local Rule 56.

Therefore, the plaintiffs' claims against Pavía Yauco for failure to screen the patient under EMTALA are hereby **DISMISSED**.

   **(ii)**  **Stabilize**

In essence, Pavía Yauco argues that the "duty to stabilize attaches when a hospital transfers a patient," therefore a "hospital cannot violate the duty to stabilize unless it transfers

a patient." **ECF No. 101** at 15. Because in this case the patient was not transferred, Pavía Yauco contends, "stabilization provisions under EMTALA are clearly inapplicable." *Id.*, at 16.

Plaintiffs, on the other hand, simply argue that Pavía Yauco's arguments are misguided in the sense that they pertain only to cases in which a transfer was effectuated. Indeed, plaintiffs' opposition to the motion for summary judgment limits its reasoning to the understanding that Pavía Yauco's "memorandum of law is [based on] the third duty imposed by provisions of EMTALA which are not in controversy since (sic) transfer never occurred." **ECF No. 110** at 9. Plaintiffs "contest that the second duty imposed by EMTALA [(*i.e.* the duty to stabilize)] is applicable to this case... Provisions regarding stabilization of a patient until discharge or transfer were clearly violated by defendants." *Id*. Plaintiffs arguments are unavailing.

The First Circuit has held that EMTALA's stabilization mandate "does not impose a standard of care prescribing how physicians must treat a critical patient's condition while he remains in the hospital, but merely prescribes a precondition the hospital must satisfy before it may undertake to transfer the patient." *Fraticelli–Torres v. Hosp. Hermanos,* 300 Fed.Appx. 1, 4 (1st Cir. 2008). Thus, the First Circuit held, "a hospital cannot violate the duty to stabilize unless it transfers a patient, as that procedure is defined in EMTALA." *Álvarez-Torres v. Ryder Meml. Hosp., Inc.,* 582 F.3d 47, 51–52 (1st Cir. 2009)(citing *Correa,* 69 F.3d at 1190 (to establish a violation of the duty to stabilize, the plaintiff must prove, inter alia, that the hospital "bade farewell" to the patient); see *Pujol-Álvarez v. Grupo HIMA-San Pablo, Inc.*, 249 F.Supp. 3d 591, 597 (D.P.R.

2017)("a hospital cannot violate the [EMTALA] duty to stabilize unless it transfers a patient")(citing *Álvarez-Torres v. Ryder Meml. Hosp., Inc, supra*.

Therefore, "[i]nterpreting the stabilization provision to apply where transfer occurs is [] fully consistent with EMTALA's statutory purpose." *Id*. Accordingly, and relevant to the case at hand, the First Circuit has held that in cases where the patient "never left [hospital]'s facilities, and… died in the room on the Medicine Floor where he was admitted… no transfer occurred, plaintiffs have not established a stabilization claim under EMTALA." *Id*.[6]

In light of the above, the Court must **DISMISS** plaintiffs' EMTALA claims against Pavía Yauco.

**VI.    Conclusion**

In light of all the above, the Court hereby **GRANTS** the motions for summary judgment at **ECF No. 101, 106** and dismisses with prejudice all of plaintiffs' claims under EMTALA. Accordingly, the motion for joinder at **ECF No. 105** is **GRANTED**.  Because all claims over which

---

[6] Notably, the only case cited by plaintiffs (*Bryant v. Adventist Health System/W.*, 289 F.3d 1162 (9th Cir. 2002)) is an out-of-Circuit case issued years before the First Circuit case law cited herein. It is also distinguishable. To wit, in *Bryant* the patient was transferred and then discharged. *Bryant*, 289 F.3d at 1164 (9th Cir. 2002)("[o]n February 20, David was released from U.C. Davis and returned home. Although David appeared to be improving, he died suddenly and unexpectedly on March 1, 1997").

the Court had original jurisdiction are dismissed, the Court hereby declines to exercise supplemental jurisdiction over plaintiffs' state law claims and thus dismisses without prejudice such claims pursuant to 28 U.S.C. § 1367(c)(3). *See Álvarez-Torres*, 582 F.3d at 53 (1st Cir. 2009)(affirming District Court's Judgment dismissing state law claims under  28 U.S.C. § 1367(c)(3) following the District Court's Opinion and Order granting a motion summary judgment filed after a pre-trial conference, *see* 576 F.Supp.2d 27 (2008)).

Accordingly, all pending motions, including the motion for summary judgment at **ECF No. 99**, are dismissed without prejudice.

The Clerk of Court is to enter judgment dismissing with prejudice all claims under federal law and dismissing without prejudice all state law claims.

**SO ORDERED**.

At San Juan, Puerto Rico, on this 18th day of March 2021.

**S/AIDA M. DELGADO-COLÓN**
**United States District Judge**